# EXHIBIT A

## ARBITRATION TRIBUNALS OF THE
## FINANCIAL INDUSTRY REGULATORY AUTHORITY

*In the Matter of the Arbitration Between:*

TIMOTHY H. DURHAM, DAVID E. BOLLMEIER
AND TYRONE R. SIMONS,

      CLAIMANTS,

  vs.  .                              Case No. 16-01396

LEGEND SECURITIES, INC.,

      RESPONDENT.

_____/

### FIRST AMENDED STATEMENT OF CLAIM

CLAIMANTS TIMOTHY H. DURHAM (hereinafter referred to as "DURHAM"),

DAVID E. BOLLMEIER (hereinafter referred to as "BOLLMEIER"), TYRONE R.

SIMONS (hereinafter referred to as "SIMONS") (collectively referred to as "CLAIMANTS")

sue LEGEND SECURITIES, INC., (hereinafter referred to as "LEGEND" or

"RESPONDENT"), and allege the following:

### JURISDICTIONAL ALLEGATION

1.      The jurisdiction of this Tribunal is invoked under the Federal Arbitration Act

and pursuant to the arbitration clauses contained in (a) the licensing agreement that

RESPONDENT LEGEND has with the Financial Industry Regulatory Authority ("FINRA"),

by which the firm individually and collectively agreed to submit all disputes and/or complaints

(i) with customers and/or (ii) arising out of or in connection with its business and/or (iii) arising

out of the employment or termination of employment of its associated persons to arbitration,

(b) FINRA *Code Of Arbitration Procedure*, and (c) the Forms U-4 of Richard Gomez

(hereinafter referred to as "Gomez") and Valery Scancella (hereinafter referred to as "Scancella"). See, e.g., Spear, Leeds & Kellogg v. Central Life Assur. Co., 85 F.3d 21 (2d Cir. 1996); Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352 (2d Cir. 1995); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001); Vestax Sec. Corp. v. McWood, 280 F.3d 1078, 1080 (6th Cir. 2002).

## GENERAL ALLEGATIONS

### i.   *TIMOTHY H. DURHAM*

2.     DURHAM resides in Bermuda and is fifty-three (53) years old.  He has an Associates' Degree in Interior Design from the Art Institute of Philadelphia. DURHAM has worked as a nurse orderly for the past 14 years.  He previously was a construction laborer.

3.     DURHAM has a net worth of approximately $45,000, consisting of cash savings of approximately $23,000 and liquid investments worth approximately $22,000.  He purchased the investment at issue with funds he received through an inheritance from his mother. DURHAM's investment history consists of mutual funds he bought through a local bank. He has never held a brokerage account.   DURHAM has never subscribed to any financial magazines or newspapers.

4.     DURHAM met Gomez through a mutual friend.  DURHAM told Gomez that he had little investment experience and was "nervous about scams."  Gomez replied that he would never do anything to jeopardize his securities license and that the investments at issue were safe.

ii.     *DAVID E. BOLLMEIER*

5.      BOLLMEIER resides in Marissa, Illinois, and is forty-one (41) years old.   He is a grain farmer.   BOLLMEIER has never subscribed to any financial magazines or newspapers.

6.      BOLLMEIER told Gomez that he wanted income producing investments and that liquidity was important to him in case he needed cash quickly.   BOLLMEIER stressed that his risk tolerance was low.

iii.    *TYRONE R. SIMONS*

7.      SIMONS resides in Sandy's Ma, Bermuda, and is sixty (60) years old. He has worked as a plumber his entire life and has only a high school degree. SIMONS has never subscribed to any financial magazines or newspapers.

8.      SIMONS rents his primary residence and has no cash savings or liquid investments.  He used all of his cash savings to purchase the investment at issue.

9.      SIMONS received a "cold call" from Gomez regarding the investments at issue. SIMONS was hesitant to invest and was persuaded by GOMEZ stating the investments at issue were "safe and would produce generous returns."

iv.     *Richard Gomez ("Gomez")*

10.     At all times relevant to the transactions alleged herein, Gomez was a registered representative, employee, and agent of RESPONDENT LEGEND. (See attached Exhibit "A.") At all times relevant hereto, Gomez was the account executive responsible for the handling of the transactions at issue with CLAIMANTS at RESPONDENT LEGEND and

was acting within the scope of his position of employment and/or agency and/or apparent agency with RESPONDENT LEGEND.

v.    *Valery Scancella ("Scancella")*

11.    At all times relevant to the transactions alleged herein, Scancella was a registered representative, employee, and agent of RESPONDENT LEGEND. (See attached Exhibit "B.") At all times relevant hereto, Scancella worked with Gomez at RESPONDENT LEGEND and was acting within the scope of his position of employment and/or agency and/or apparent agency with RESPONDENT LEGEND.    Scancella split with Gomez the commission(s), at a minimum, on the BOLLMEIER transactions at issue.

vi.    *Praetorian and U.S. Coal Corporation*

12.    RESPONDENT, acting through Gomez and Scancella, recommended that CLAIMANTS invest in the Praetorian G Power V, LLC ("Praetorian") and U.S. Coal Corporation common stock ("U.S. Coal"). RESPONDENT failed to conduct a reasonable due diligence on these unregistered securities, these investments were misrepresented to CLAIMANTS as conservative, low risk investments, the risks of these investments were not disclosed to CLAIMANTS, and these recommendations were unsuitable for CLAIMANTS given his financial situation, needs and investment objectives.

13.    RESPONDENT LEGEND, acting through Gomez and Scancella, made the following false representations, among others, to CLAIMANTS:

> a.    Praetorian offered investors the opportunity to purchase pre-initial public offering ("IPO") shares of companies such as Facebook, Inc., Groupon Inc., and Zynga, Inc.

   b.    U.S. Coal was a private company that produced coal in
         central Appalachia.

   c.    Both of these investments were safe and were about to go
         public.

14.    RESPONDENT LEGEND, acting through Gomez and Scancella, failed to
make the following material disclosures, among others, to CLAIMANTS:

*Praetorian*

   a.    Praetorian's fund manager had a lengthy criminal record
         that included multiple convictions for grand theft.

   b.    In 2009, the SEC sued Praetorian's fund manager and the
         president of Praetorian's purported escrow service for
         securities fraud and obtained judgments against both.

   c.    In March 2011, the SEC filed a securities fraud lawsuit
         against another individual associated with Praetorian.

   d.    **Praetorian was a fraudulent offering. Rather than using
         investor funds to purchase pre-IPO shares, its fund
         manager and the president of its purported escrow
         service used investor funds for personal expenses.**

   e.    RESPONDENT and Gomez failed to conduct a
         reasonable due diligence. Gomez had no prior experience
         conducting due diligence in private placement offerings.
         Also, Gomez missed or ignored numerous red flags
         presented to him. For example, Praetorian's purported
         escrow service's "place of business" was in a residential
         apartment building in Boca Raton, Florida, and its
         "mailing address" was the address of "The UPS Store" in
         Boca Raton, Florida.

*U.S. Coal*

   a.    RESPONDENT and Gomez failed to conduct a
         reasonable due diligence. Gomez had no prior experience
         conducting due diligence in private placement offerings.

> Gomez's representation that the company was planning an IPO in the "near future" was based on statements from individuals interested in selling U.S. Coal shares. U.S. Coal had no specific plans for an IPO.

(See attached Exhibit "C.")

## I.   RESPONDENT LEGEND'S SYSTEM OF SUPERVISION OVER OFF-SITE BROKERS SUCH AS GOMEZ WAS INADEQUATE

15.   Gomez and Scancella may have been independent contractors with RESPONDENT LEGEND. However, FINRA has made clear on numerous occasions that broker/dealers may not avoid their supervisory obligations by entering into independent contractor relationships with their agents. In Notice to Members 86-65 (9/12/86), FINRA specifically noted that:

> Irrespective of an individual's location or compensation arrangements, **all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with FINRA rules governing the conduct of registered persons and the supervisory responsibilities of the member.** The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

(See attached Exhibit "D," at 1-2.)

A.     **RESPONDENT LEGEND Negligently Failed to Research Gomez's and Scancella's Backgrounds, Negligently Hired Gomez and Scancella, and Negligently Failed to Place Gomez and Scancella Under Special Supervision.**

16.     FINRA Rule 3010(e), part of FINRA supervisory rule previously numbered Article III, Section 27, provides that "[e]ach member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications and experience of any person prior to making such a certification in the application of· such person for registration with this association." In FINRA Notice to Members 88-67, dated September 1988, FINRA reminded LEGEND and all other brokerage firms that "member firms have an obligation to thoroughly research a potential employee's background before hiring such person," and that "FINRA has brought disciplinary actions against member firms who have failed to properly research a potential employee's background prior to hiring such person." (See attached Exhibit "E.")

17.     RESPONDENT LEGEND knew that Gomez had been associated with fourteen (14) different brokerage firms in the past eight (8) years. (See Exhibit "A.") Such itinerant employment is considered a red flag in the securities industry, raising questions concerning the broker's sales practices, financial situation and commitment to the securities industry.

18.     RESPONDENT LEGEND also knew or should have known that Gomez was experiencing financial problems. A prior employer, Brill Securities, Inc., noted on Gomez's U-5 that Gomez still owed the firm $24,847.41, and that he was paying off this debt in installments. (See Exhibit "A," at p. 4.)

19.     Given Gomez's itinerant employment history and financial problems, RESPONDENT should not have hired Gomez. At a minimum, RESPONDENT should have placed Gomez under special supervision, but negligently failed to do so. Scancella had a similar employment history and RESPONDENT negligently hired Scancella and negligently failed to place Scancella under special supervision as well.

20.     While Gomez and Scancella were registered with LEGEND, LEGEND allowed Gomez and Scancella to operate other businesses. The SEC has stated that **"allowing a registered representative to engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws."** Broker-dealers must **"require independent verification of such matters as the nature and extent of outside business activities and a representative's outside sources of income."** See Prospera Financial Services, Inc., Exchange Act Rel. No. 43352 (September 26, 2000); PFS Investments, Inc., Exchange Act Rel. No. 40269 (July 28, 1998).

21.     RESPONDENT LEGEND'S procedures and compliance system were deficient because the firm did not take any steps to review Gomez's and Scancella's outside business activities and confirm that they were not using their outside businesses to sell unregistered securities. By not requesting, inspecting and independently verifying documentation from Gomez and Scancella concerning their outside businesses, RESPONDENT LEGEND failed to properly supervise them.

> "Allowing a registered representative to engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws. Although [the broker/dealer] required that representatives obtain permission before engaging in outside

business activities, the [broker/dealer] had no procedures for reviewing, analyzing, or following up on the information representatives provided concerning their outside activities. [The broker/dealer's] procedures were deficient for failing to require inspections of its off-site offices that were not registered as branches with the NASD or to require independent verification of such matters as the nature and extent of outside business activities and a representative's outside sources of income."

Signal Securities, Inc., Exchange Act Rel. No. 43350 (September 26, 2000); Walnut Street

Securities, Inc., Exchange Act Rel. No. 35975 (July 17, 1995).

22.     Gomez and Scancella did not generate significant commission revenue while

associated with RESPONDENT LEGEND. LEGEND failed to investigate how they were

supporting themselves in view of their lack of production, which in and of itself is a "red flag"

of selling away activities. (See e.g., Consolidated Investment Services, Inc., SEC Release No.

34-36687 (1/5/96) ("CIS [the brokerage firm] assumed that McCormick's [the broker's] decline

in production was due to the fact that he was going to focus his energies on this non-securities

business venture . . . however, CIS knew little about McCormick's outside business venture and

took no steps to find out about it or determine the reason for the decline.")

## II.     RESPONDENT'S SALE OF HIGH-RISK AND FRAUDULENT INVESTMENTS TO CLAIMANTS

23.     During all periods material hereto, RESPONDENT LEGEND was licensed and

authorized to do business in the States of New York and Illinois and did business in New York

and Illinois through Gomez and Scancella, registered representatives of RESPONDENT

LEGEND. RESPONDENT LEGEND is a registered securities broker/dealer with the States

of New York and Illinois and the Securities and Exchange Commission ("SEC") and a member

of the Financial Industry Regulatory Authority ("FINRA").

24.    RESPONDENT agreed and undertook to perform the duties of a securities broker, financial consultant, and brokerage firm relative to recommending and supervising the recommendations of the transactions at issue with CLAIMANTS.

25.    The acts of RESPONDENT LEGEND and each employee, agent, and representative of RESPONDENT LEGEND are deemed to be the acts of and are chargeable to and binding upon RESPONDENT LEGEND under principles of agency law, licensing, controlling person and the doctrine of *respondeat superior.*

26.    RESPONDENT knew that CLAIMANTS trusted it to disclose all material facts concerning the investments recommended to them and to comply with all SEC, FINRA and state licensing requirements. Throughout the course of their investment relationship, RESPONDENT sought to and did engender CLAIMANTS' trust and confidence in its ability and willingness to do anything in its power to properly advance all of CLAIMANTS' investment objectives and needs. A fiduciary relationship existed between CLAIMANTS and RESPONDENT.

27.    In total disregard for CLAIMANTS' investment objectives, RESPONDENT, acting through Gomez and Scancella, recommended that CLAIMANTS invest in the following high-risk and fraudulent investment programs:

| CLAIMANTS | DATE | INVESTMENT | AMOUNT |
|-----------|------|-----------|--------|
| DURHAM | 7/04/11 | The Praetorian G Power V, LLC | $50,000 |
| DURHAM | 9/13/11 | U.S. Coal Corporation | $35,000 |
| BOLLMEIER | 6/22/11 | The Praetorian G Power V, LLC | $20,000 |

| CLAIMANTS | DATE | INVESTMENT | AMOUNT |
|-----------|------|------------|--------|
| BOLLMEIER | 6/22/11 | The Praetorian G Power V, LLC | $20,000 |
| SIMONS | 6/11/11 | The Praetorian G Power V, LLC | $50,000 |
| SIMONS | 6/11/11 | U.S. Coal Corporation | $100,000 |
| | | TOTAL: | $275,000 |

28.    After CLAIMANTS' purchase of these fraudulent investments from RESPONDENT, CLAIMANTS were continuously and fraudulently misled. The truth was fraudulently concealed from them. CLAIMANTS believed that these investments were safe. RESPONDENT, acting through Gomez and Scancella, never corrected these misrepresentations.

29.    In that regard, it should also be pointed out that RESPONDENT had complete and total control of CLAIMANTS' accounts from their inception through the life of the accounts. RESPONDENT knew that CLAIMANTS trusted it and relied upon it to act in CLAIMANTS' best interests, and promoted this trust and confidence. CLAIMANTS made clear and RESPONDENT knew full well that CLAIMANTS totally relied upon it to make the investment recommendations.

30.    RESPONDENT falsely represented to CLAIMANTS that these investments were low risk. In addition, RESPONDENT failed to review the material terms and risk factors of these investments with CLAIMANTS, and failed to inform CLAIMANTS that these investment programs were fraudulent and were not approved by RESPONDENT. RESPONDENT continuously assured CLAIMANTS that these investments were conservative

and suitable for individuals whose primary investment objective was safety of principal. These misrepresentations and non-disclosures continued after the investments and were never corrected. RESPONDENT knew that CLAIMANTS did not want and could not afford any risk.

31.     RESPONDENT failed to disclose to CLAIMANTS that these investments were fraudulent, high-risk investments that were unsuitable for CLAIMANTS in view of their financial situations, needs and investment objectives.

32.     RESPONDENT failed to comply with FINRA *Conduct Rules* 2310 and 2810. FINRA Rule 2310(a) reads as follows:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

33.     FINRA Rule 2810 governs direct participation (i.e., limited partnership) programs. Rule 2810(b)(2) (*Suitability*) reads in pertinent part as follows:

> **Rule 2810(b)(2)(B)**: In recommending to a participant the purchase, sale, or exchange of an interest in a direct participation program, a member or person associated with a member shall:
>
> i.      have reasonable grounds to believe, on the basis of information obtained from the participant concerning his investment objectives, other investments, financial situation and needs, and any other information known by the member or associated person, that:
>
> (a)      the participant is or will be in a financial position appropriate to enable him to realize **to a**

**significant extent** the benefits described in the prospectus, **including the tax benefits** where they are a significant aspect of the program;

(b)    the participant has a fair market net worth sufficient to **sustain the risks inherent in the program, including loss of investment and lack of liquidity**; and

(c)    the program is otherwise suitable for the participant; and

ii.    maintain in the files the member documents disclosing the basis upon which the determination of suitability was reached as to each participant.

34.    Rule 2810(b)(3) sets forth the following specific **due diligence responsibilities** of member firms that participate in the public offering of a direct participation (limited partnership) program:

**Rule 2810(b)(3)(A)**: Prior to participating in a public offering of a direct participation program, a member or person associated with a member shall have reasonable grounds to believe, based on information made available to him by the sponsor through a prospectus or other materials, that all material facts are adequately and accurately disclosed and provide a basis for evaluating the program.

**Rule 2810(b)(3)(B)**: In determining the adequacy of disclosed facts pursuant to subparagraph (A) hereof, a member or person associated with a member shall obtain information on material facts relating at a minimum to the following, if relevant in view of the nature of the program:

(1)    Items of compensation;

(2)    Physical properties;

(3)    Tax aspects;

(4)     <u>Financial stability and experience of the sponsor</u>[1];

(5)     <u>The program's conflicts and risk factors</u>; and

(6)     Appraisals and other pertinent reports.

**Rule 2810(b)(3)(D)**: Prior to executing a purchase transaction in a direct participation program, a member or person associated with a member shall inform the prospective participant of all pertinent facts relating to the liquidity and marketability of the program during the term of the investment.

(Emphasis added.)

35.     FINRA Rule 2810's predecessor, Appendix F of the NASD *Rules of Fair Practice*, was only adopted after years of review and comment. The initial version was published for comment on May 9, 1972, and subsequent versions were published in 1973, 1977, 1978, and 1981. The final version of Appendix F was approved by the Securities and Exchange Commission on July 19, 1982, and circulated to all NASD member firms, including RESPONDENT LEGEND, on October 19, 1982. (See <u>FINRA Notice to Members 82-50</u>.) RESPONDENT LEGEND failed to implement this <u>Notice to Members</u> and discuss the special suitability requirements of FINRA 2810 with Gomez and Scancella before allowing them to recommend these high-risk, fraudulent investments to CLAIMANTS. These investments were particularly disadvantageous to CLAIMANTS in view of their interest in low-risk investments.

36.     RESPONDENT'S conduct was clearly in violation of FINRA rules governing suitability, due diligence and risk disclosure (including but not limited to Rules 2310 and 2810).

---

[1]     <u>See also</u> <u>SEC v. Murphy</u>, 626 F.2d 633, 643 (9th Cir. 1980) (In connection with an investment in a limited partnership, information relating to those who are responsible for the success or failure of the enterprise is clearly material).

CLAIMANTS were not informed of all pertinent facts relating to the degree of liquidity and lack of marketability of these programs.

37.     RESPONDENT, acting through Gomez and Scancella, misrepresented and omitted to disclose numerous material facts to CLAIMANTS concerning these investments, their operations, the risks involved in these investments, and the use of funds obtained from the sale of these investments to CLAIMANTS and others. RESPONDENT failed to review the risks of these investments with CLAIMANTS. These misrepresentations and non-disclosures continued after the initial investment and were never corrected.

38.     In connection with the above offers of securities RESPONDENT, acting through Gomez and Scancella, failed to disclose the following material facts, among others, which were necessary to disclose in order to make the statements made, in light of the circumstances under which they were made, not misleading:

    a.     The financial condition of the issuers.

    b.     The potential risks of investing in these programs.

    c.     The use of investment proceeds.

    d.     The nature of the association between the issuers and companies that rendered services to the issuers.

    e.     The percentage of investments used for sales commissions and other offering expenses.

    f.     The identity, background, experience and disciplinary history of the individuals associated with the issuers, including the issuers's officers and principals.

39.     It is well-settled that a brokerage firm which recommends a security has a duty to ensure that its representations have a reasonable basis:

> In summary, the standards . . . are strict. [A salesman] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. <u>By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.</u> Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

<u>Hanley v. SEC,</u> 415 F.2d 589, 595-97 (2nd Cir. 1969) (emphasis added).[2] In short, a broker-dealer must not only "know the customer," but the broker-dealer must also know the "security." RESPONDENT did not "know" these investments because it failed to conduct a reasonable investigation ("due diligence") into these fraudulent, high-risk investments before recommending these securities to CLAIMANTS.

---

[2]     See also <u>Mac Robbins & Co.</u>, 41 S.E.C. 116-119 (1962), <u>Aff'd. Sub. Nom. Berko v. S.E.C.</u>, 316 F.2d (2d Cir. 1963) ("The making of recommendations to prospective purchasers without a reasonable basis, couched in terms of either opinion or fact, designed to induce purchases, is contrary to the basis obligation of fair dealing borne by those who engage in the sale of securities to the public."); <u>Alexander Reid & Co.</u>, 40 S.E.C. 986-990 (1962) (A broker's recommendation must be "responsibly made on the basis of actual knowledge and careful consideration."); <u>Securities Exchange Act Release No. 6721 (February 2, 1962)</u> ("the making of recommendations for the purchase of a security implies that the dealer has a reasonable basis for such recommendations, which in turn, requires that, as a prerequisite, he shall have made a reasonable investigation:); <u>Rice, Recommendations by a Broker-Dealer: the Requirement for a Reasonable Basis</u>, 25 Mercer L.Rev. 537 (1974) (A broker that does not have a reasonable basis for recommending a particular security cannot satisfy the suitability rule, "since a broker-dealer would have difficulty contending that a recommendation was suitable for a given customer when you lack adequate information about the security involved.")

40.    RESPONDENT failed to disclose to CLAIMANTS that RESPONDENT had not conducted a proper due diligence on these investments. RESPONDENT LEGEND allowed Gomez and Scancella to hold themselves out as licensed representatives of RESPONDENT LEGEND and did not disclose to CLAIMANTS that the firm had not reviewed these investments and that the firm was not properly supervising Gomez and Scancella. These misrepresentations and non-disclosures continued after the initial investment and were never corrected.

41.    RESPONDENT violated its fiduciary duty to CLAIMANTS by handling CLAIMANTS' accounts in a manner that benefitted RESPONDENT the most, i.e., maximization of commissions by purchasing high-risk, fraudulent investments rather than acting in the best interests of CLAIMANTS, making material misrepresentations, failing to disclose material facts, failing to conduct a proper due diligence, and causing transactions that were inappropriate for CLAIMANTS given their financial position, needs, and investment objectives.

42.    FINRA Rule 3010 requires that each member establish and maintain a system to supervise the activities of each registered representative that is reasonably designed to achieve compliance with applicable securities laws and regulations and with the rules of FINRA. It must include written procedures that are established, maintained, and enforced. RESPONDENT LEGEND did not have an adequate system of supervision. There was no system for on-site or off-site supervisory review of representations, recommendations, and

actions by its registered representatives. In actuality, RESPONDENT LEGEND simply relied upon its off-site salesmen to supervise themselves.

43.     RESPONDENT LEGEND'S supervisory procedures were deficient in that it did not have any system to track the investment history, including any prior high-risk, long term illiquid investments, of its clients, and monitor for excessive concentration. Accordingly, supervisory personnel, including the Compliance Department, could not exercise effective supervision and determine whether or not a specific recommendation would result in an over-concentration of high-risk investments in view of the customer's liquid net worth, financial situation, investment objectives and needs.

44.     RESPONDENT LEGEND'S failure to establish and implement adequate supervisory procedures over Gomez is inexcusable, particularly in view of FINRA's dissemination to RESPONDENT LEGEND of FINRA Notice to Members 86-65, dated September 12, 1986, which expressly warned FINRA member firms that FINRA had observed a pattern of rule violations and other regulatory problems stemming from the employment of registered persons who engage in securities-related activities on a full and part-time basis at locations away from the offices of the member. FINRA pointed out that these off-site representatives, often classified for compensation purposes as independent contractors, are involved in other business enterprises such as insurance, real estate sales, accounting, or tax planning, and also frequently operate as separate business entities under names other than those of the members. FINRA made the following observations concerning the regulatory responsibilities of member firms that are of particular relevance to this case:

Page 18 of 164

Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with FINRA rules governing the conduct of registered persons and the supervisory responsibilities of the member. The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

Firms employing off-site representatives are responsible for establishing and carrying out procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities and to detect and prevent regulatory compliance problems. This can include:

1.   Educating off-site personnel regarding their obligations as registered persons to the firm and to the public, including prohibited sales practices.

2.   Maintaining regular and frequent contact with such individuals.

3.   *Implementing appropriate supervisory practices, such as records inspections and compliance audits at the representatives' places of employment, to ensure that their methods of business and day-to-day operations comply with applicable rules and requirements. For greatest effectiveness in preventing and detecting violations, visits should be unannounced and include, for example, a review of on-site customer account documentation and other books and records, meetings with individual representatives to discuss the products they are selling and their sales methods, and an examination of correspondence and sales literature.*

Firms whose off-site personnel also engage in non-securities businesses should remind these individuals that correspondence pertaining to such businesses, unless submitted for review, may not include material related to securities transactions.

If a member has designated an individual responsible for reviewing the activities of other registered persons within the firm, the office of that individual must be inspected annually, regardless of whether such person is compensated as an employee or as an independent contractor.

Page 19 of 164

> The actions of an associated person in dealing with customers and customer account, regardless of whether he or she is compensated as an employee or an independent contractor, are actions on behalf of the firm. The firm is responsible for supervising in a manner designed to detect and prevent violations of Section 2 [FINRA suitability rule]. Members should take affirmative steps to ensure that off-site personnel understand and abide by FINRA and firm policies regarding dealings with customers, customer account and customer funds.

(See Exhibit "D.")(Emphasis added.)

45.     FINRA Notice to Members 86-65 expressly urged each member to duplicate the Notice and distribute it individually to all associated persons, and indicated that FINRA, in the course of its member examinations, would make inquiry to ascertain that this Notice had been provided to all appropriate personnel. (See Exhibit "D.")

46.     Upon information and belief, RESPONDENT LEGEND never gave a copy of FINRA Notice to Members 86-65 to Gomez and Scancella, and failed to properly educate them concerning their obligations as registered persons, including prohibited sales practices.

47.     FINRA Notice to Members 86-65 indicates it is not the first admonition by FINRA on this subject. As early as 1982 FINRA circulated to all member firms an SEC Notice Concerning Independent Contractors dated June 18, 1982, which indicated that "to the extent that a firm forms a relationship with an independent contractor, that firm would be responsible for either (1) ensuring that the independent contractor was registered as a broker-dealer or (2) assuming the supervisory responsibilities attendant to a relationship with an associated person." FINRA noted that "it would be advisable if [this SEC Notice] were distributed to all registered and compliance personnel in your firm, including branch office personnel." FINRA further noted:

Broker-dealers may not shift their obligation to control or supervise the activities of their independent contractor salespersons who are associated persons, and contractual terms that attempt to limit broker-dealer <u>liability for the acts of such persons</u> under the federal securities laws are of no effect. . . . [I]n this connection, we also believe that it is important to emphasize that a simple denial of "control" of an independent contractor by a broker-dealer would not remove its responsibility for supervising that person.

(<u>See</u> Exhibit "F," attached hereto.)

48.    RESPONDENT committed numerous violations of FINRA *Rules of Fair Practice* in handling these transactions with CLAIMANTS, including:

      A.    FINRA Rules 2010, 2310, 2020, and 2150, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending securities that RESPONDENT did not "know," by recommending transactions that were unsuitable and excessive in view of CLAIMANTS' financial situation, needs and investment objectives, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations, by failing to make material disclosures, by selling CLAIMANTS fraudulent investments; and

      B.    FINRA Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

49.    RESPONDENT'S violations of FINRA rules constitute negligence. As the Fifth Circuit observed in <u>Miley v. Oppenheimer & Co., Inc.</u>, 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly

included a reference to these rules in its jury charge. See <u>Mihara v. Dean Witter & Company,</u> <u>Inc.,</u> 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.")

50.     RESPONDENT also violated the following rules, among others, of the Illinois Administrative Code:

    a.     RESPONDENT failed to maintain a written record of the transaction with CLAIMANT in violation of Section 130.850.

    b.     RESPONDENT effected or caused to be effected transactions with CLAIMANT which was unsuitable in view of CLAIMANT'S financial resources and the character of his accounts in violation of Section 130.853.

51.     RESPONDENT'S violations of the New York and Illinois Administrative Codes constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS.

> [B]ased on my finding that Plaintiffs are members of the class the [state] securities acts were designed to protect and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. See [Palmer v. Shearson Lehman Hutton, Inc., 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for [ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); accord [Twiss v. Kury, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

Prymak v. Contemporary Financial Solutions, Inc., 2007 WL 4250020, at *10 (D. Colo. Nov. 29, 2007).

52.     Further, the contracts between RESPONDENT and CLAIMANTS include not only securities industry rules and regulations, but also the internal rules and regulations established to govern the conduct of RESPONDENT LEGEND'S own employees (Gomez), such as the internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Smith Barney, Harris Upham & Co., 1986 WL 2762, at *5 (S.D.N.Y. Feb. 27, 1986). For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its Standard Practice Instructions Manual, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. Montgomery v. Balt. & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts § 33 (4th Ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

53.     RESPONDENT LEGEND violated numerous of its own policies in connection with these fraudulent Praetorian and U.S. Coal investments to CLAIMANTS.

54.     The acts committed by RESPONDENT LEGEND and its employees, agents, and representatives, as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce. The acts of RESPONDENT LEGEND and

its employees, agents, or representatives as alleged herein are deemed to be the acts of and are chargeable to and binding upon RESPONDENT LEGEND.

55.     RESPONDENT LEGEND is directly liable because it participated in, aided, and/or supervised the transactions heretofore mentioned. RESPONDENT LEGEND is also liable under the doctrines of *respondeat superior*, licensing, controlling person, and agency principles for the negligent actions and breaches of duty by Gomez and Scancella, while in the scope of their employment with RESPONDENT LEGEND.

56.     CLAIMANTS have been greatly damaged as a result of RESPONDENT'S misconduct. Instead of receiving safety and income, CLAIMANTS were saddled with fraudulent investments. CLAIMANTS seek the recovery of damages in the amount of at least **$275,000** against RESPONDENT, as well as benefit of the bargain damages, lost opportunity costs, model portfolio damages, and prejudgment interest from RESPONDENT. CLAIMANTS' claims include all investments wrongfully sold to CLAIMANTS.

57.     Prejudgment interest is an element of damages which is mathematically computed from the date of the purchase. In re MetLife Demutualization Litigation. 624 F. Supp. 2d 232, 271 (E.D.N.Y. 2009) (Damages under the securities laws include prejudgment interest.); Weft, Inc. v. G.C. Investment Assoc., 630 F. Supp. 1138, 1144 (E.D.N.C. 1986) ("Plaintiffs are also entitled to interest on the amount paid in exchange for the partnership units from the date of purchase."); Henson v. Morgan Stanley DW Inc., 2005 WL 1806426, at *6 (M.D. Tenn. 2005) (vacating securities arbitration award that was not issued in accordance with the "mathematical calculation of damages," including prejudgment interest).

58.     RESPONDENT'S failure to conduct a proper due diligence, misrepresentations, omissions and unsuitable recommendations to CLAIMANTS were egregious, as were RESPONDENT'S supervisory omissions. These acts by RESPONDENT LEGEND and its agents constitute independent torts for which CLAIMANTS seek recovery. In addition, these acts were done with wanton, reckless disregard of the rights and property of CLAIMANTS and CLAIMANTS are also entitled to punitive damages in an amount to be determined by the arbitration panel.

59.     Punitive damages are further warranted due to RESPONDENT'S *fraudulent concealment* of its misconduct, which constitute independent torts for which CLAIMANTS seek recovery. RESPONDENT, acting through Gomez and Scancella, continuously assured CLAIMANTS that these investments were safe investments and that their principal was not at risk. RESPONDENT LEGEND failed to disclose the inaccurate and incomplete nature of their representations, failed to conduct a proper due diligence, and failed to disclose that these securities were fraudulent, unapproved investments.

60.     RESPONDENT LEGEND'S failure to disclose the inaccurate and incomplete nature of Gomez's and Scancella's representations, its lack of due diligence, the fraudulent nature of these Praetorian & U.S. Coal investments and the resulting concentration of CLAIMANTS' account in these fraudulent investments, RESPONDENT LEGEND'S failure to supervise, and the fact that these securities were unregistered in violation of state and federal law, not only warrant punitive damages but toll all statutes of limitation periods in view of RESPONDENT LEGEND'S fiduciary relationship with CLAIMANTS and constitute

independent torts for which CLAIMANTS seek recovery. The Southern District of Florida

made the following statement on the issue of fraudulent concealment in a fiduciary

relationship:

> . . . [T]he law of fraud 'does not require that an aggrieved party have proceeded
> from the outset as though he were dealing with thieves.' First Federal Savings &
> Loan Assoc. v. Dade Federal Savings & Loan Assoc., 403 So.2d 1097, 1100 (5th
> DCA 1981).
>
> The existence of a fiduciary relationship between the Plaintiff and the
> Defendant, and silence on the part of the Defendant when there is a duty to
> disclose facts, can constitute a fraudulent withholding of facts. Less than full
> disclosure on the part of a Defendant in a fiduciary relationship lawsuit, can be
> sufficient to establish fraudulent concealment.

Wilder v. Meyer, 779 F. Supp. 164, 168-69 (S.D. Fla. 1991). In short, where a fiduciary

relationship exists, acts of omission (failure to disclose material facts) can constitute

fraudulent concealment.

61.     This can also be seen in Vucinich v. PaineWebber Jackson & Curtis, Inc. et al,

803 F.2d 454 (9th Cir. 1986), where the court held that the fiduciary relationship that exists

between a broker and his customer imposes upon the broker the duty to monitor the customer's

accounts and affirmatively advise the client as to any changed circumstances. The Court found

that the broker's representations regarding monitoring of a customer's accounts tolled the

running of the statute of limitations [e.g., the prescription period] until such time as the broker

fulfilled his obligation to advise the customer regarding matters relevant to possible

misrepresentations. (Citing Twomey v. Mitchum, Jones, & Templeton, Inc., 262 Cal. App. 2d

690 727-729, 69 Cal. Rptr. 222 (1968). Further, the fraudulent concealment cannot be mitigated

by the mere forwarding of a prospectus containing information that contradicts material

representations made orally to investors. Luksch et al. v. Latham, 675 F. Supp. 1168 (N.D. Cal. 1987). See also In Re Robert A. Foster, Sec. Ex. Rel. No. 34408 (July 20, 1994) ("broker/dealers and their registered representatives 'owe a special duty of fair dealing to their clients.' The making of misrepresentations runs directly contrary to those fiduciary duties" and can render a broker/dealer liable in private actions "even where the investor has access to a prospectus providing full disclosure").

62.    A fiduciary relationship of trust and confidence exists between brokers and their customer. Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes,

controls the account); <u>Jaksich v. Thomson McKinnon Securities, Inc.</u>, 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); <u>Utah State University of Agriculture and Applied Science v. Sutro & Co.</u>, 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); <u>E.F. Hutton & Co. v. Weeks</u>, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

63.     All limitations periods are tolled under the legal doctrines of accrual, continuous treatment, continuous representation, and continuing wrong.[3] <u>See, e.g.</u>, <u>Keller v. Reed</u>, 603 So.2d 717, 719 (Fla. 2d DCA 1992) (accrual); <u>Hall v. Steiner</u>, 543 N.Y.S.2d 190 (N.Y. App. Div. 1989) (continuous treatment); <u>Wilder v. Meyer</u>, 779 F.Supp. 164 (S.D. Fla. 1991) (continuous representation); and <u>Newport Largo, Inc. v. Monroe County</u>, 706 F.Supp. 1507 (S.D. Fla. 1988) (continuing wrong). Further, all limitations periods are tolled under the doctrine of "blameless ignorance" or "*contra non valentem agere nulla currit praescriptio.*" This doctrine stops the running of the limitations period when the cause of action is not known or reasonably knowable by CLAIMANTS even if their ignorance was not induced by RESPONDENT. Stated simply, CLAIMANTS did not comprehend that they had been sold high-risk, illiquid and unsuitable investments and that their legal rights had thus been violated.

---

[3]     Statutes of limitation of course only apply in civil actions, not arbitration proceedings.

64.     In Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 332 (5th Cir. 1981), the Fifth

Circuit cited the following passage from Goldberg's book entitled *Fraudulent-Dealer Practices*

in support of awarding punitive damages that is very appropriate in this case:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in
> the till, to simply request the removal of the offending appendage. And when the
> till is empty, and the broker-dealer's fingerprints are all that remain where the
> money once lay, all the courts do is to require the crook to replace the booty. If
> ever there was a situation where crime pays it is in such circumstances; heads the
> dishonest broker-dealer wins and tails everyone breaks even. No wonder one
> commentator saw fit to term the average recovery in trading cases as creating for
> the broker-dealer a "low risk larceny."
>
> . . . [T]he only sure way of deterring such conduct in the future is to take the
> profit away from the wrongdoers and slap on an additional amount as punitive
> damages: an award equal to treble damages would be fair, reasonable, and well
> within the public interest.

65.     The Arbitrator's Manual states the following in a quote from Aristotle:

> Equity is justice in that it goes beyond the written law. And it is
> equitable to prefer arbitration to the law court, for the arbitrator
> keeps equity in view, whereas the judge looks only to the law, and
> the reason why arbitrators were appointed was that equity might
> prevail.

CLAIMANTS seek relief in equity, including restitution, rescission, specific performance, and

any other equitable relief which this Panel deems appropriate.

## COUNT I

## VIOLATIONS OF FEDERAL SECURITIES LAWS

66.     CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 65

above, as if fully contained herein.

67.     The investments sold to CLAIMANTS and described in paragraphs 1 through 66 above were securities as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

68.     Under Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, RESPONDENT LEGEND was a controlling person over the conduct described in paragraphs 1 through 67 above.

### A.     Offer and Sale of an Unregistered Securities

69.     RESPONDENT, by engaging in the conduct described in paragraphs 1 through 68 above, directly, indirectly, or through persons that it controlled, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell or sold securities, or, directly or indirectly, carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

70.     No registration statement was filed with the Securities and Exchange Commission or was in effect with respect to these investments during the offerings of the securities sold to CLAIMANTS.

### B.     Fraud in Offer or Sale of Securities

71.     RESPONDENT, by engaging in the conduct described in paragraphs 1 through 70 above, directly, indirectly, or through persons it controlled, offered to sell or sold securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included

an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

72.     By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(2), 77*o*.

### C.     Fraud in Connection With the Purchase or Sale of Securities

73.     RESPONDENT, by engaging in the conduct described in paragraphs 1 through 72 above, directly, indirectly, or through persons it controlled, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

      a.     Employed devices, schemes, or artifices to defraud;

      b.     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

74.     By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**WHEREFORE,** CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, punitive damages, and such other relief as is deemed proper and necessary.

## COUNT II

### VIOLATION OF NEW YORK CONSUMER PROTECTION ACT -- N.Y. GEN. BUS. LAW § 349

75.     CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 74 above, as if fully contained herein.

76.     RESPONDENT, by engaging in the conduct previously described, was engaged in a deceptive practice that affected the public interest and had a broad impact on consumers at large. These material deceptive acts or practices were consumer-oriented and directed to consumers and caused actual harm.

77.     The deceptive conduct engaged in by RESPONDENT as previously described, was misleading in material respects and from which conduct CLAIMANTS were injured.

78.     CLAIMANTS have a private right of action to redress the deceptive act or practices outlined above pursuant to N.Y. Gen. Bus. Law § 349. (See Scalp & Blade, Inc., et al. v. Advest, Inc., 722 N.Y.S.2d 639, 640-41 (March 21, 2001), wherein the court held:

> Given the statute's explicit prohibition of "deceptive acts or practices in the furnishing of any service" (General Business Law § 349[a]), and given the Court of Appeals' characterization of the statute as "applying to virtually all economic activity" (Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 55), we see no basis for invoking any blanket exception under the statute for securities transactions (see, Breakwaters Town Homes Assn. of Buffalo v. Breakwaters

of Buffalo, 207 A.D.2d 963, 616 N.Y.S.2d 829) or for limiting the statute's applicability to the sale of "goods."

79.     CLAIMANTS have  been obligated to pay reasonable attorneys' fees in conjunction with this litigation and is entitled to an award of reasonable attorneys' fees pursuant to N.Y. Gen. Bus. Law § 34(h) and for recovery of damages.

**WHEREFORE,** CLAIMANTS pray for statutory recovery of damages plus interest plus reasonable attorneys' fees and punitive damages in an amount to be determined by the arbitrators.

## COUNT III

### VIOLATION OF ILLINOIS SECURITIES LAW
*(ASSERTED BY CLAIMANT BOLLMEIER ONLY)*

80.     CLAIMANT realleges, reaffirms, and reincorporates paragraphs 1 through 79 above, as if fully contained herein.

81.     Pursuant to Section 13(B) of the Illinois Securities Law of 1953, 815 ILCS 5/13(B), CLAIMANT has sent notification to RESPONDENT, by registered mail or certified mail, return receipt requested, of CLAIMANT'S election to treat as voidable the investment sales to CLAIMANT that are alleged herein, within six months after CLAIMANT had knowledge that the sales were voidable.

### A.     Failure to Register Praetorian in Illinois

82.     Sections 5 and 6 of the Illinois Securities Law of 1953 state that it is unlawful to offer or sell any security in Illinois unless the security is registered under the Illinois Securities Law of 1953. 815 ILCS 5/5, 5/6.

Page 33 of 164

83.     Sections 12 and 13 of the Illinois Securities Law of 1953 state that every sale made in violation of Sections 5 and 6 may be rescinded at the election of the purchaser. 815 ILCS 5/12, 5/13. Pursuant to such rescission, the purchaser is entitled to recover the full amount paid for the security together with interest in the amount of 10% per annum or the interest rate stipulated in the security sold, whichever is higher, less any income or other amounts received by the purchaser on a security.

84.     Given Praetorian's lack of registration in Illinois, CLAIMANT is entitled to rescission of his investments as well as interest at the statutory rate.

### B.     Unsuitable Recommendations, Misrepresentations and Omissions of Material Fact

85.     Sections 12 and 13 also state that a purchaser is entitled to rescission, along with interest at the statutory rate, from a brokerage firm that:

1.     Offers or sells a security in violation of any of the provisions of the Illinois Securities Law of 1953.

2.     Fails to provide a purchaser with a prospectus that meets the requirements of the Illinois Securities Law of 1953 either before or at the time of confirmation of the transaction.

3.     Engages in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

4.     Obtains money or property through the sale of securities by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

5.    Employs any device, scheme, or artifice to defraud in connection  with the sale or purchase of any security, directly or indirectly.

815 ILCS 5/12, 5/13.

86.    RESPONDENT, acting through Gomez and Scancella, made numerous false and misleading statements to CLAIMANT both orally and in writing concerning Praetorian and failed to disclose numerous material facts to CLAIMANT concerning Praetorian, all as more fully stated above.  Further, RESPONDENT, acting through Gomez and Scancella, violated numerous provisions of the Illinois Securities Law of 1953 and engaged in devices, schemes or artifices to defraud in connection with the transactions at issue.  CLAIMANT accordingly is entitled to rescission of his Praetorian transactions pursuant to Sections 12 and 13 of the Illinois Securities Law of 1953.  815 ILCS 5/12, 5/13.

87.    RESPONDENT is also liable under Section 13(A) of the Illinois Securities Law of 1953, 815 ILCS 5/13(A), which states that every controlling person and broker-dealer who participates in or aids in the sale is also liable jointly and severally with and to the same extent as the seller.

**WHEREFORE**, CLAIMANT  prays  for compensatory and recessionary damages under the Illinois Securities Law of 1953, reimbursement of costs and attorneys fees, and punitive damages.

## COUNT IV

## VIOLATION OF ILLINOIS CONSUMER FRAUD
## AND DECEPTIVE BUSINESS PRACTICES ACT
### *(ASSERTED BY CLAIMANT BOLLMEIER ONLY)*

88.     CLAIMANT realleges, reaffirms, and reincorporates paragraphs 1 through 87 above, as if fully contained herein.

89.     RESPONDENT, acting through its employee/agent, by engaging in the conduct previously described, engaged in unfair methods of competition or unfair or deceptive acts or trade practices in violation of 815 ILCS 505/2 and 510/2, including but not limited to:

A.      Use or employment of deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of material facts;

B.      Practices causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval of the securities at issue or a likelihood of confusion or misunderstanding as to the affiliation, connection, or association of the broker with RESPONDENT;

C.      Deceptive representations in connection with the investments at issue;

D.      False representations that the investments at issue had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they in fact did not have;

E.      False representations regarding the standard, quality, or grade of the investments at issue; or

F.      Other conduct which similarly created a likelihood of confusion or misunderstanding.

90.     RESPONDENT, acting through its employee, intended that the CLAIMANT rely on the deception described above.  This deception occurred in the course of conduct involving trade or commerce which caused damages.

91.     Pursuant to 815 ILCS 505/10(a), CLAIMANT is entitled to an award of damages, attorneys' fees, and costs.

**WHEREFORE**, CLAIMANT requests statutory recovery of damages, plus interest, attorneys' fees, costs, and punitive damages in an amount to be determined by the arbitrators.

## COUNT V

## BREACH OF CONTRACT

92.     CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 91 above, as if fully contained herein.

93.     The contractual relationships which were entered into between CLAIMANTS and RESPONDENT incorporate by reference a brokerage house's duty to comply with all laws, rules, and regulations governing the transactions between RESPONDENT and CLAIMANTS. It must be emphasized that RESPONDENT fraudulently induced CLAIMANTS to enter into this contractual relationship by, among other things, the false representations and non-disclosures of material facts by RESPONDENT that are itemized in this Statement of Claim.

94.     RESPONDENT violated, among others, the following rules of FINRA *Rules of Fair Practice* in handling these transactions with CLAIMANTS, including:

> A.     FINRA Rules 2010, 2310, 2020, and 2150, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence

investigation, by recommending securities that RESPONDENT did not "know," by recommending transactions that were unsuitable and excessive in view of CLAIMANTS' financial situation, needs and investment objectives, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

B.   FINRA Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

95.   These infractions breached the contractual relationship between CLAIMANTS and RESPONDENT, which incorporated a brokerage firm's duty to comply with the industry rules, customs and procedures governing the transactions with CLAIMANTS. "[W]e note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker." Brumm v. McDonald & Co. Sec., 603 N.E.2d 1141, 1147 (Ohio Ct. App. 1992) (citations omitted); Iowa Grain v. Farmers Grain and Feed, 293 N.W.2d 22 (Iowa 1980); White v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 218 A.2d 655 (N.J. Super. Ct. 1966). See also Midwest Television v. Scott, Lancaster, Mills & Atha, 252 Cal. Rptr. 573, 579 (Cal. Ct. App. 1988) ("The industry practice becomes a part of the contract, and the evidence of such custom is admissible. . . .").

96.     Likewise, the New York and Illinois Broker/Dealer Administrative Codes are incorporated into the contractual agreement between CLAIMANTS and RESPONDENT. "[L]aw, existing at the time the contract is formed, becomes a part of the contract. Valid agency rules and regulations, promulgated within the agency's authority, have the force and effect of law." See e.g., Kinnard v. Homann, 750 S.W.2d 30, 31-32 (Tex. Ct. App. 1988) (citations omitted). "It is fundamental that the laws of Florida are a part of every Florida contract." Department of Ins. v. Teachers Ins. Co., 404 So. 2d 735, 741 (Fla. 1981).

97.     The contracts between RESPONDENT and CLAIMANTS are further defined by the internal rules and regulations established to govern the conduct of RESPONDENT'S own employees, such as internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Smith Barney, Harris Upham & Co., 1986 WL 2762, at *5 (S.D.N.Y. Feb. 27, 1986). ("The relations between [brokerage firm and customer] were not defined solely in terms of the joint account agreement, but also . . . by the internal rules and regulations established to 'govern the conduct of [the firm's] own employees"). For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F. 2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its *Standard Practice Instructions Manual*, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. Montgomery v. Balt & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts §33 (4th ed. 1971). The

District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

98.    RESPONDENT violated many of its own internal rules and procedures in handling these transactions with CLAIMANTS.

99.    RESPONDENT also violated the duty of commercial reasonableness, fair dealing, and good faith, required of all parties to a contract. "Hornbook Law implies a covenant of good faith and fair dealing into the performance and enforcement of every contract. . . . [G]ood faith is part of every contract . . . ." First Texas Sav. Ass'n v. Comprop Inv. Properties, 752 F. Supp. 1568, 1573 (M.D. Fla. 1990); Burger King Corp. v. Austin, 805 F. Supp. 1007 (S.D. Fla. 1992). This covenant of fair dealing is particularly demanding for stockbrokers and brokerage firms, who are expert fiduciaries of their customers, who obtain their commissions only after advising and inducing customer investments, and who are thereby subject to an inherent conflict of interest.

> [P]etitioner acted simultaneously in the dual capacity of investment advisor and of broker and dealer. In such capacity, conflicting interests must necessarily arise. When they arise, the law has consistently stepped in to provide safeguards in the form of prescribed and stringent standards of conduct on the part of the fiduciary.

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949).

100.    The covenant of good faith and fair dealing require RESPONDENT to do what the contract presupposed would be done to accomplish its purpose and to protect the contracting parties' reasonable expectations. It presupposed that RESPONDENT would comply with applicable industry and governmental rules, provide all necessary information to

CLAIMANTS, and act reasonably and in good faith to recommend suitable investments for CLAIMANTS in light of CLAIMANTS' financial circumstances and needs. RESPONDENT violated this covenant by putting its own interests first, not complying with industry rules, recommending wholly unsuitable investments to CLAIMANTS, and misrepresenting, concealing and not supplying material information. CLAIMANTS suffered damages from these breaches of covenant and are entitled to recompense.

101.   RESPONDENT'S infractions breached its written contracts with FINRA to follow securities laws and FINRA rules. As a condition of RESPONDENT'S FINRA membership applications pursuant to Article IV, Section 1 of FINRA By-Laws, RESPONDENT contracted with FINRA to comply with all FINRA rules, federal securities laws, and federal securities rules and regulations in the handling of customer accounts.

102.   Defrauded customers such as CLAIMANTS are intended third-party beneficiaries of RESPONDENT'S agreements with FINRA to comply with securities laws and regulations and FINRA rules. CLAIMANTS are entitled to redress for RESPONDENT'S breaches of these contracts. Oppenheimer & Co. v. Neidhardt, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶98,224 (S.D.N.Y. May 4, 1994) (customers are third-party beneficiaries of brokerage firm's obligation to follow FINRA rules); Scobee Funeral Home v. E.F. Hutton & Co., 711 F. Supp. 605, 607 (S.D. Fla. 1989) (customers are third-party beneficiaries of FINRA requirements); Creative Sec. v. Bear Stearns & Co., 671 F. Supp. 961, 966 (S.D.N.Y. 1987) ("Many courts recognize that securities exchange members are contractually bound by the regulations of their organizations."); Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d

828, 841 (2d Cir. 1971) ("Each member firm, by virtue of its admission, agrees to be governed by the Exchange's constitution and rules. When a transaction of purchase and sale of any security is effected, the contract is subject to all the provisions of the Exchange's constitution and rules. . . . These provisions are binding on exchange members.")

103.    RESPONDENT'S failure to comply with the contracts between the parties and with the laws, rules, and regulations governing the contracts between the parties, was intentional or reckless and was done in willful and wanton disregard of CLAIMANTS' rights. All of RESPONDENT'S actions and omissions were done solely for the purpose of generating commissions, and as such is conduct for which the RESPONDENT should be punished.

**WHEREFORE,** CLAIMANTS request this panel to enter an award for actual and rescissionary damages together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

COUNT VI

**COMMON LAW FRAUD**

104.    CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 103 above, as if fully contained herein.

105.    All of the misrepresentations and omissions of RESPONDENT were done with the intent to mislead CLAIMANTS and with the specific intent to have CLAIMANTS rely on said misrepresentations and omissions. At a minimum, the misrepresentations were done

recklessly, without knowledge of their truth or falsity. CLAIMANTS did rely thereon and made investments to their detriment causing substantial losses.

106.    Further, RESPONDENT'S misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

107.    The fraud, the misrepresentations, and the omissions claims are quasi-contractual in nature and arose from and are implied from the contractual relationship between CLAIMANTS and RESPONDENT. This claim also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

**WHEREFORE,** CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

**COUNT VII**

**<u>BREACH OF FIDUCIARY DUTY</u>**

108.    CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 107 above, as if fully contained herein.

109.    At all times relevant hereto there existed between the RESPONDENT and CLAIMANTS a fiduciary relationship by reason that:

> A.    The RESPONDENT at all times possessed superior knowledge, judgment, skill, and experience in the

Page 43 of 164

securities market in contrast to CLAIMANTS' lack of meaningful knowledge and understanding in that CLAIMANTS could not fully appreciate the substantial risk to which their monies were exposed; and

B.   The RESPONDENT at all times had access to the books, records, and other sources of information concerning the financial and operating condition, rules, and policies of the RESPONDENT, FINRA, and the State Statutes and Administrative Codes. This information was not readily accessible to CLAIMANTS; and

C.   Gomez, at all times while handling CLAIMANTS' monies, was an experienced account executive acting within the scope of his employment and authority and apparent authority with RESPONDENT LEGEND.

110.   This fiduciary duty arose from and is implied from the contractual relationship between CLAIMANTS and RESPONDENT. This fiduciary duty also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

111.   Because of the RESPONDENT'S superior knowledge, skill, judgment, and experience in the securities market, the RESPONDENT owed to CLAIMANTS a duty to recommend suitable investments, to disclose all material facts, and to refrain from misleading CLAIMANTS. Further, the RESPONDENT owed this fiduciary duty to protect and further CLAIMANTS' interests over and above its desire to generate commissions through the transactions with CLAIMANTS and to promote its own interests. RESPONDENT LEGEND specifically had a duty by virtue of this fiduciary relationship with CLAIMANTS to conduct a proper due diligence, to supervise Gomez's and Scancella's recommendations and representations, and to disclose to CLAIMANTS that these securities were fraudulent investments, that Gomez's and Scancella's representations to CLAIMANTS concerning these

investments were incomplete and inaccurate, and that RESPONDENT LEGEND was not properly supervising Gomez and Scancella.

112.    A special relationship of trust and confidence exists between a securities salesman and his customer. Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes his customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock

brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

113.    Because of the fiduciary relationship between CLAIMANTS and the RESPONDENT, CLAIMANTS reasonably relied to their detriment on the RESPONDENT'S superior knowledge, skill, judgment, and experience in handling their monies.

114.    RESPONDENT knowingly and deliberately breached its fiduciary duty to CLAIMANTS by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and investing in fraudulent securities in total disregard for CLAIMANTS' best interests, solely for the purpose of enriching and protecting the RESPONDENT, and concealing the unsuitable nature of these transactions by not making the requisite disclosures to CLAIMANTS. The RESPONDENT'S disregard and violation of the rules of the SEC and FINRA governing its conduct and the conduct of RESPONDENT LEGEND'S agents and employees constitutes a breach of fiduciary duty to CLAIMANTS.

115.    RESPONDENT also breached its fiduciary duty by failing to ensure compliance with all applicable state statutes and rules, including those relating to misrepresentations and omissions in the sale of securities, suitability, and registration.

116.    The acts committed by RESPONDENT, as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce. RESPONDENT is jointly and severally liable because it participated in, supervised, or

approved the previously noted transactions. In addition, LEGEND is jointly and severally liable under the principles of licensing, agency, controlling person and *respondeat superior* for the damage caused to CLAIMANTS by the breach of its fiduciary duty. The acts of LEGEND, and each employee, agent, or representative of LEGEND, including Gomez, are deemed to be the acts of and are chargeable to and binding upon LEGEND.

> brokerage firm owes a higher duty to its customers than to other employers. The implicit reasoning . . . that brokers have a higher public duty under the securities laws than do other persons leads to imposition of a duty to exercise a high standard of supervision. This duty is enforceable through imposition of secondary liability based on respondeat superior.

Sharp v. Coopers & Lybrand, 649 F.2d 175, 182 (3d Cir. 1981).

117.   RESPONDENT'S breach of its fiduciary duty to CLAIMANTS constitutes conduct for which the RESPONDENT deserves to be punished to deter RESPONDENT from engaging in the same or similar conduct in the future.

WHEREFORE, CLAIMANTS request this panel to enter an award for actual damages together with benefit of the bargain damages, rescissionary damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT VIII

## NEGLIGENCE AND GROSS NEGLIGENCE

118.   CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 117 above, as if fully contained herein.

119.    RESPONDENT, by virtue of its position as CLAIMANTS' broker-dealer, its professional skill and ability, the level of confidence and care imposed upon other broker dealers and brokers in similar positions, and its fiduciary obligations owed CLAIMANTS due care. The industry standard of care is set forth by FINRA, the SEC rules, the State Acts and Administrative Codes, and the firms' own internal guidelines.

120.    RESPONDENT'S violations of FINRA Rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.")

121.    RESPONDENT'S violations of the New York and Illinois Administrative Codes constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS.

> [B]ased on my finding that Plaintiffs are members of the class the [state] securities acts were designed to protect and their injuries were of the kind the Acts were enacted to prevent, I find Plaintiffs have alleged sufficient facts to support their sixth claim based on negligence *per se*. See [Palmer v. Shearson Lehman Hutton, Inc., 622 So. 2d 1085, 1090 (Fla. Dist. Ct. App. 1993)] (denying summary judgment on plaintiff's negligence per se claim because "a jury could lawfully find that [defendant-securities firm] knowingly and willfully filed with the [state regulatory authorities] false information concerning the reason for

[ex-employee/tortfeasor's] termination, in violation of the legal obligations intended to protect investors from such conduct that were imposed on [defendant-securities firm] by [state securities laws]"); accord [Twiss v. Kury, 25 F.3d 1551, 1555-56 (11th Cir. 1994)].

Prymak v. Contemporary Financial Solutions, Inc., 2007 WL 4250020, at *10 (D. Colo. Nov. 29, 2007).

122.   RESPONDENT LEGEND had supervisory duties over Gomez, and failed to diligently and properly supervise its officers, employees, and agents.

123.   Gomez and Scancella were at all times material hereto acting within the scope of their employment with RESPONDENT LEGEND and RESPONDENT LEGEND is also liable under principles of *respondeat superior*, licensing, controlling person and agency.

124.   RESPONDENT'S conduct, as set forth in previous Counts, is a breach of its duty to CLAIMANTS.

125.   RESPONDENT breached its duty to CLAIMANTS by failing to provide sufficient control and supervision over its officers, employees, agents, and registered representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-regulatory organization policies, and procedures.

126.   RESPONDENT'S actions as set forth above constitute both negligence and gross negligence.

127.   As a result of the RESPONDENT'S conduct as set forth above, CLAIMANTS have suffered damages.

128.   The RESPONDENT'S conduct as set forth above proximately caused CLAIMANTS' damages.

**WHEREFORE**, CLAIMANTS have been greatly damaged as a result of RESPONDENT'S misconduct. Instead of receiving safety, CLAIMANTS were saddled with fraudulent investments. CLAIMANTS seek the recovery of damages in the amount of at least **$275,000** against RESPONDENT, as well as bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, and punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

## CERTIFICATE OF SERVICE

I certify that a copy hereof was furnished to Respondent, Frank Fusco, CCO, Legend Securities, 45 Broadway, 32nd Floor, New York, NY 10006, by U.S. Certified Mail, this 15th day of July, 2016.

Respectfully Submitted,

GOODMAN & NEKVASIL, P.A.

Kalju Nekvasil, Esq.
Florida Bar No. 0866946
Stephen Krosschell, Esq.
Florida Bar No. 0351199
14020 Roosevelt Blvd., Suite 808
P.O. Box 17709
Clearwater, Florida 33762
Telephone:    727-524-8486
Facsimile:    727-524-8786
Attorneys for CLAIMANTS